# Shirley *v.* Southern Ry. Co.

### Death on Track.

(Decided November 30, 1916.   73 South. 430.)

1. **Railroads; Death on Track; Jury Question.**—Under the evidence in this case it was a question for the jury whether the engineer saw decedent in a place of danger, and after so seeing her, wantonly or intentionally, or heedlessly ran his engine upon her.

2. **Evidence; Account Books; Statutes.**—Where two negro employees of a coal mine testified they saw decedent on the track, the pay roll of the mine, shown to be in the handwriting of the timekeeper, and to have been made by him in discharge of his duties as such, and in the due course and conduct of the mining business of the company, was admissible to show that the negroes who testified were in the mine at the time they testified that they saw decedent· upon the track; the entries on the payroll as to them being competent evidence of the collateral fact of their whereabouts at the time, the entrant being beyond the jurisdiction of the court.

3. **Same.**—Such entries on the payroll were admissible, although the payroll was made up by the timekeeper from memorandum reports of each day's mining operation made to him by the several timekeepers in the mine, and not. from personal knowledge.

4. **Evidence; Best and Secondary.**—Where the matter sought to be proven was a collateral fact, the best evidence rule does not apply.

APPEAL from Walker Circuit Court.

Heard before Hon. J. J. CURTIS.

Suit by Marian Shirley against the Southern Railway Company for damages for the death of her intestate. Judgment for defendant and plaintiff appeals. Affirmed.

RAY & COONER, for appellant.   BANKHEAD & BANKHEAD, for appellee.

THOMAS, J.—This is a suit for damages for the death of plaintiff's intestate, Mrs. Belle Shirley, alleged to have been caused by her being struck by a train of the Southern Railway Company.

Said intestate was an inmate of an infirmary at Corona, Ala., where she had been operated on. During the night she escaped from the hospital, and was found lying on defendant's right of way, between 7 and 8 o'clock on the morning of March 14, 1915,

by the crew of a passing train. At the place where intestate was found the track was straight for some distance in the direction from whence the train came. Intestate was found lying on the left side of the track, according to the way the train was proceeding.

The engineer in charge of said engine testified for the defendant that he was on the right side of his engine, keeping a lookout down the track in front of his engine, and that he saw no one near or on the track.

The conductor in charge testified that he was at the time on the engine; that he was standing back of the engineer and was looking out of the engineer's window, down the track; and that he saw no one on or near the track.

The fireman testified that he had been fixing his fire, and that as he got up on the box again he saw Mrs. Shirley for the first time; that she was lying lengthwise with the ties, perfectly still; that he saw her as the cylinder of the engine passed her, but did not see her on the track; that he called to McKibbon, the conductor, and Chappell, the engineer, that some one was there beside the track. There was testimony to show that when Mrs. Shirley was first seen by this witness she was lying at right angles with the track with her head resting on her arm, her head being about at the end of the crossties; that she was wet and cold and shivering, and apparently unconscious, when picked up.

On former appeal (*Southern Railway Co. v. Shirley*, 189 Ala. 568, 66 South. 511) this court held that the defendant was entitled to the general affirmative charge because of insufficient testimony to warrant the inference by the jury that the engineman in charge of this locomotive saw the intestate in a place of danger, and, after so seeing her, wantonly or intentionally or heedlessly ran the engine upon her.

The cases of *Southern Railway Co. v. Stewart*, 179 Ala. 304, 66 South. 927, *Carlisle v. A. G. S. R. R. Co.*, 166 Ala. 591, 52 South. 341, *Southern Railway Co. v. Bush*, 122 Ala. 470, 26 South. 168, *Southern Railway Co. v. Shelton*, 136 Ala. 191, 34 South. 194, *L. & N. R. R. Co. v. Calvert*, 172 Ala. 597, 55 South. 812, and *N. A. R. Co. v. Guttery*, 189 Ala. 604, 66 South. 580, are distinguishable from the *Shirley Case*. It was observed in the *Shirley Case* that: "In those cases, where it has been held that, notwithstanding the enginemen's testimony that they were keeping a lookout at the time of striking the injured person, and

did not see him on or near the track in front of the engine, it was a question for the jury whether or not in fact they did see him, the rulings rest upon the assumption that some of the evidence showed that the injured person was in fact upon the track, and hence they must have seen him in spite of their denials."

The same distinction may be made as to *Louisville & Nashville Railroad Co. v. Jenkins,* 196 Ala. 136, 72 South. 68, where many authorities on this question were collected.

The lack of evidence on the former appeal that the injured person was in fact upon the tracks or in dangerous proximity thereto, and hence must have been seen by the enginemen, in spite of their denials, was clearly met by plaintiff on the last trial by the testimony of the two witnesses Bud Boone and Smith Cooper. Referring specifically to the testimony of these two witnesses, as illustrative of the materiality of the evidence offered for the purpose of impeachment, the witness Boone testified that he and Smith Cooper saw Mrs. Shirley on the railroad track walking between the rails towards Patton Junction; that witness was proceeding along the dirt road immediately adjacent and parallel to the railroad track; that they saw Mrs. Shirley before they saw the train; that after witness saw her he "went about 25 or 30 steps before the train passed" going east towards Birmingham on the main line on which Mrs. Shirley was walking; saw the train just a few minutes after he saw Mrs. Shirley, and that "the train was about as far from her as the distance across this courthouse or not so far;" that witness left Patton between 5 and 6 o'clock of that morning, arriving at Corona between 7 and 8 o'clock, stopped a few minutes at one place on the way, then went to his home, and thence to the commissary, where he heard of Mrs. Shirley's injury. Witness fixed the time at which he heard of the injury at "about 7 o'clock," and stated that Smith Cooper and he separated at the depot. Witness further stated that at that time he was working at Corona, loading coal at No. 3 mines; that he and others so engaged in the mines were required to work every day when there was coal to load.

Smith Cooper testified substantially as did the witness Boone, to seeing Mrs. Shirley walking along the main line on which the defendant's train proceeded. He said: "I could see the engineer and fireman looking ahead toward her. It seemed to me that she just had on her nightclothes with something around her like a shawl or coat. I don't think she had on any shoes;

looked like she had on white stockings, or something of the kind. We went on to Corona from there. The train was going in the direction she was. At this time the woman, in my best judgment, was 300 or 400 yards east of Corona."

On cross-examination this witness further stated that he was working at Corona at the time, in No. 3 mines; did not remember whether there was any work that day or not; that he went to work about 6 or 7 o'clock when he worked in the mines; that witness passed this woman about 7 o'clock or a little after; that he did not look back to see if the train hit her; that witness could see Mrs. Shirley several hundred yards before witness passed her, and "could see the engine down the road then;" that he saw the fireman at his window and saw the engineer on his seat; that he heard of the accident about 20 minutes after he came to Corona.

(1) Thus the plaintiff's testimony was materially different from that shown by the record on the former appeal. The case was brought by this evidence within the purview of the *Bush, Calvert, Guttery* and *Jenkins Cases,* and presented a question of fact for the decision of the jury.

Defendant sought to impeach witnesses Boone and Cooper by the introduction in evidence of the mine pay roll, and especially that portion thereof showing that said witnesses "had time turned in on said pay roll for the 14th day of March, 1912," the day, according to witnesses' testimony, on which they saw Mrs. Shirley at the time and place and under the circumstances detailed. The pay roll was shown to be in the handwriting of one George Adams, who was on March 14, 1912 (the day of the alleged injury), timekeeper for the Corona Coal & Iron Company, and for its mine No. 3; and it was further shown that Adams was not then a citizen of Alabama, but was in the state of Mississippi. It was also in evidence that at the time in question the men working for the company were required to go into the mines at 7 o'clock. Defendant's insistence was that, if said witnesses were working in the mines on the day Mrs. Shirley was found, as the pay roll tended to show, at and after 7 o'clock a. m., they could not have been at the place indicated by witnesses as where they saw Mrs. Shirley at the time specified. The court entertained the opinion that it was necessary to produce the witness who prepared the pay roll in order to make the roll competent evidence for the purpose of impeachment, and on

plaintiff's motion excluded that document from the consideration of the jury.

The bill of exceptions proper, aside from the motion for a new trial, does not recite that on this adverse ruling of the court the defendant pleaded surprise as to the testimony, or made a motion for a continuance or passing of the case until the witness Adams could be secured or his deposition taken. This was, however, recited in the motion for a new trial.

The trial proceeded to a judgment in favor of the plaintiff. The defendant then moved the court to set aside the judgment and grant a new trial, and among other grounds assigned the following: "The defendant developed on examination of said witnesses that they had only received their subpœnas a day or two before the trial, and that at the time Mrs. Shirley died, and also when she was found near the track, they were working at No. 3 mines of the Corona Coal & Iron Company. Defendant telephoned on Friday evening to the offices of the Corona Coal & Iron Company, and found that their pay roll for the day that Mrs. Shirley was found on the railroad track showed that both witnesses were at work that day, but that the person who made said pay roll, to-wit, George Adams, was out of the state. Defendant arranged for one of the employees of the Corona Coal & Iron Company who knew the handwriting of the said George Adams to bring the pay roll to court on the following morning. Said employee appeared at court on the said Saturday morning with the pay roll, and after proving that said pay roll was in the handwriting of said George Adams, and that the said George Adams was in the state of Mississippi, and said pay roll showing that both of said witnesses worked on the day that Mrs. Shirley was found on the railroad track, defendant offered said pay roll in evidence. The plaintiff objected to the introduction of said pay roll on the ground that no witness was produced who had testified to its correctness. The court sustained the objections, and the defendant then made an application to the court to pass or continue the case so as to give the defendant an opportunity to secure the presence of the said George Adams or his testimony. The court overruled the application."

Defendant supported this motion by affidavits of the said George Adams and T. J. Cook showing how the pay roll or the time of men working for the Corona Coal & Iron Company was kept during the month of March, 1912, and on, to-wit, the 14th

[Shirley v. Southern Ry. Co.]

day thereof, in the regular course of business, and in the keeping of the daily entries thereof.

The affiant Cook states that the conduct of the regular business and the keeping of the daily entries of said Corona Coal & Iron Company with its said employees engaged in the mining of coal was in this wise: "As mine foreman at said mine, I was required to and did make and turn in to the timekeeper, Mr. George Adams, at the end of each day's work at the mine, what was known as 'daily time report,' a yellow sheet of paper about 8 inches wide and about 22 inches long, which was provided me for the purpose for which it was used, and at the bottom of said sheet I signed by name or initials under the words, 'Certified to be correct,' which meant that the information shown in the report was true and correct. Said 'daily time report' each made by me as mine foreman showed the time made by each man * * * who worked in or about the said mine, except that said reports did not include the names or the time made by any of the subcontractors or any of the men who worked for or with such subcontractors only in said mine. Each subcontractor in said mine had one and sometimes two entries in the mine to work in, and each subcontractor worked his own helpers, whose time was turned in each day to Mr. George Adams, the timekeeper by the subcontractors. * * * The regular work hours prescribed by me as mine foreman were from 7 o'clock in the morning to 5 o'clock in the afternoon, inclusive, for the day shift. * * * I required the men who worked inside and outside the said mine to keep said hours in order to operate the mine efficiently. * * * The men who worked on the day shift * * * were required by me to leave the mouth of the mine between 6:30 and 7 o'clock in the morning, and to be inside the mine and ready to begin work at 7 o'clock a. m. * * * Every man working on the day shift at said mine had to be there and ready to go to work at 7 o'clock a. m. When a man was not at the mine at said hour ready to go to work, I secured the services of another man to take his place, regardless of whether he worked directly under me or for a subcontractor. Occasionally some of the machinemen had to wait a short while in the morning for the blacksmith to get their picks sharpened, but they never had to wait more than an hour, as it did not take the blacksmith long to sharpen the picks. Such machinemen while waiting for their picks to be sharpened were required to remain

at the mine and go into the mine and begin work as soon as the picks were ready for them. I have before me the daily time report made out and signed by me covering the operation of said mine No. 3 for and during the 14th day of March, 1912. Said report was made out by me and signed by me, and the same is today exactly as it was when I turned it in to Mr. Adams, the timekeeper, except that Mr. Adams, as was the custom, added to the report by putting opposite to their names the amount of money made by each man whose name was shown by me thereon. This report is absolutely correct, and it shows that the aforesaid mine was operated on the said 14th day of March, 1912, and that 397 tons of coal were brought out of said mine and loaded on railroad cars during said day. Independently of said daily time report, I know that said mine No. 3 run on the 14th day of March, 1912."

The affiant George Adams' deposition was to the effect that: "I live at 806 Main street, Greenville, Washington county, Miss. During the year 1912 and 1913 and up to August, 1914, I was timekeeper for the Corona Coal & Iron Company at Corona, Walker county, Ala., and as such timekeeper I kept the time for Corona mine No. 3, and I personally made and kept the pay roll for said mine. I balanced said pay roll each day, and on said pay roll was shown the name of and amount of time made each day by every man who worked at or in said Corona mine No. 3. Said pay roll was made by me, and no other person had anything to do with keeping or making it. I have before me the pay roll for said Corona mine No. 3 for the month of March, 1912. Said pay roll was made by me, and the writing therein was done only by me. The information shown in and on said pay roll is correct. Said pay roll shows that Smith Cooper, a negro, worked in said mine No. 3 on March 11, 12, 13, 14, 15, and 16, 1912, and that Bud Boone, a negro, worked in said mine on March 11, 12, 14, 15, and 16, 1912, that said Smith Cooper made as wages the sum of $2.14 for work done by him on March 14, 1912, and that said Bud Boone made as wages the sum of $2.25 for work done at said Corona mine No. 3 on said March 14, 1912. Said March, 1912, pay roll is in the same condition today as it was when finished by me at the end of said month; and no erasures or alterations of any kind or nature have been made on said pay roll."

(2) By section 4003 of the Code of 1907, the books of account of any merchant, shopkeeper, physician, blacksmith, or other person doing a regular business and keeping daily entries thereof may be admitted in evidence as proof of such accounts between the parties upon the statutory conditions.

When the pay roll was first offered in evidence and rejected on plaintiff's motion, it was shown to be in the handwriting of George Adams, the timekeeper, and to have been made in the discharge of his duties as such and in the due course and conduct of the mining business of the Corona Coal & Iron Company, that it was the record from which all of that company's employees (including witnesses Boone and Cooper) were paid for the month of March, 1912, and that the entrant George Adams was at the time of the trial beyond the jurisdiction of the court, as a citizen of another state. So far as this record discloses, this pay roll was free from evidences of untrustworthiness when before the trial court. Moreover, it was not made to appear to the trial court that the entrant Adams did not have personal knowledge of the facts entered on said pay roll, nor that said roll was compiled by him from oral or written reports made by some other transactor who knew the facts reported. We do not concede that the rule of evidence would be different if such facts had been shown. Such entries on the pay roll as to Boone and Cooper were competent evidence of the collateral fact—their whereabouts at or just after 7 o'clock a. m., March 14, 1912—whether they were at work in mine No. 3 of the Corona Coal & Iron Company, or were proceeding along the road between Patton Junction and Corona, and witnessing the facts to which they had testified in the instant case.—*Sharp v. Blanton,* 194 Ala. 460, 69 South. 889; 1 Greenl. Ev. (16th Ed.) 120; 2 Wigmore, Ev. 1521, 1530; 4 Chamberlayne, Ev. § 3058, et seq.

(3) Appellant insists, however, that the affidavits introduced on the motion for a new trial showed that the pay roll was made up by George Adams, the general timekeeper, from memorandum reports of each day's mining operations of the company for the month of March, 1912, made to him by the several timekeepers in the mine, and that said Adams, when making up the pay roll for said month, had no personal knowledge of the facts he transcribed thereon.

If we keep in mind the distinction between the class of entries, (1) made in the regular course of business and duty at or

about the time the facts stated occurred, by third persons who are unavailable as witnesses, and (2) account book entries, and (3) declarations relating to the res gestæ, and (4) declarations against interest, there will be little difficulty in deciding the question presented by the ruling of the trial court in excluding the evidence in question.

Mr. Hughes, in his work on Evidence (page 177, § 3), points out this distinction as follows: "Account book entries, to be admissible as such, must be contained in the books of a party to the suit; while entries made in the regular course of business may be made in the books of a stranger to the suit. Again, the former entries must be contained in account books; while the latter may be contained in any book. Then again in the case of the former entries the entrant may be living, and in court; while in the case of the latter the entrant must be unavailable as a witness. Declarations relating to the res gestæ must be contemporaneous with the acts done, and be so intimately interwoven with them as to be regarded as parts of them; while declarations made in the regular course of business may be made within a reasonable time after the transactions occur. Declarations against interest are, of course, adverse to the declarant; while declarations made in the regular course of business may be in his favor."

Mr. Hughes declares for the admission in evidence of such entries made in the regular course of business and duty by a third person who is not accessible as a witness, and that personal knowledge of the entrant is not required (page 119).

Discussing such entries made in the due course of business on reports of salesmen, timekeepers, and teamsters, Mr. Wigmore (Evidence, vol. 2, § 1530) declares that the same must be received in evidence: (1) Where the entrant is deceased, and the actor in the transaction swears to the correctness of his original memorandum or oral report, that the element of personal knowledge is sufficiently supplied, and the entry of B., if made in the regular course of business, is admissible; (2) Where the transactor is deceased, but B., the entrant, swears to the entry as correctly representing the transactor's memorandum or report, in which case B.'s entry would be sufficient as supplying the element of the transactor's personal knowledge, provided it was made in the regular course of business, and the production of this memorandum is impossible because of its destruction. This

[Shirley v. Southern Ry. Co.]

author is further of the opinion that, where the report was oral, it would none the less have been made in the regular course of business.

"In short," he says, "there is every reason for taking as admissible these oral reports of deceased persons in the regular course of business and duty, supplying the element of personal knowledge, and correctly recorded in the entry by B."

Mr. Wigmore then treats of the case where both B. and S., entrant and transactor, are deceased. "Here," he says, "there is presented the first and second cases combined. If we concede admissibility for those two cases, it must be conceded for this also.· One more consideration remains to be noted. The supposition in the above cases was that B., or S., or both, were deceased. But suppose, instead, that S., the salesman, teamster, or the like, is otherwise unavailable; is the result to be any different? It need not be. · In the language of Chief Justice Shaw (*North Bank v. Abbott,* 13 Pick. [Mass.] 465, 471, 25 Am. Dec. 334): 'The ground is the impossibility of obtaining the testimony; and the cause of such impossibility seems · immaterial.' Now the ordinary conditions of mercantile and industrial life in some offices do in fact constantly present just such a case of practical impossibility. Suppose an offer of books representing transactions during several months in a large establishment. In the first place, the employees have in many cases changed, and ·the former ones cannot be found; in the next place, it cannot always be ascertained accurately which employee was concerned in each one of the transactions represented by the hundreds of entries; in the third place, even if they could be ascertained, the production of the scores of employees to attend court and identify in tedious succession the detailed items of transactions would interrupt and derange the work of the establishment,. and the evidence would be obtained at a cost practically prohibitory; and, finally, the memory of such persons, when summoned, would usually afford little real aid. If unavailability or impossibility is the general principle that controls [volume 2, Wig. Ev. § 1521], is this not a real case of unavailability? Having regard to the facts of mercantile and industrial life, it cannot be doubted that it is. In such a case it should be sufficient if the books were verified on the stand by a supervising officer who knew them to be the books of regular entries kept in that establishment, and the production on the stand of a regiment of book-

keepers, salesmen, shipping clerks, teamsters, foremen, or other subordinate employees should be dispensed with."

In the *North Bank Case, supra,* Chief Justice Shaw said: "It was further contended that due notice to the defendant as indorser was not given and proved, as required by law, to charge him. It was in evidence that the messenger of the bank, whose duty it was to give notices, had absconded before the trial; that diligent inquiries had been made with a view to obtain his testimony, which had proved wholly unavailing; whereupon evidence was offered of a minute book kept by him, with the testimony of the cashier, explaining the manner of keeping and the purposes for which the book was kept. This was objected to and admitted. No case is precisely in point; but upon the authority of analogous cases, and the reason of the principle, we think this evidence was rightly admitted. In *Welsh v. Barrett,* 15 Mass. 380, it was held that such a book kept by the messenger of a bank, after his decease, is admissible to establish demands and notices. The ground is that they are memoranda made by an officer in the ordinary course of his business, and before any controversy or question has arisen. In *Nicholls v. Webb,* 8 Wheat. 326 [5 L. Ed. 628], it was decided that the minute book of a deceased notary might be received in evidence for the like purpose. In the case of *Union Bank v. Knapp,* 3 Pick. (Mass.) 96 [15 Am. Dec. 181], it was decided by this court that the books of a bank which had been kept by a clerk who had become insane were admissible upon proof of his handwriting and that the books were kept by him in the regular course of his business. The only distinction between these cases and the case at bar is that here, for aught that appears, the witness is still living. But it was satisfactorily proved, not merely that the witness was out of the jurisdiction of the court, but that it had become impossible to procure his testimony. We cannot distinguish this, in principle, from the case of death, or alienation of mind."— *McDonald v. Carnes,* 90 Ala. 147, 7 South. 919; *Dismukes v. Tolson,* 67 Ala. 386; *Elliott v. Dycks,* 78 Ala. 150.

Mr. Chamberlayne (4 Mod. Law of Ev. § 3074) declares of such entries made on joint knowledge in the course and conduct of a business that practical administration does not in all cases require proof that the entrant should have had personal knowledge of the truth of what appears upon the entry. Under the complicated conditions of modern business the person who makes

the entries seldom does anything else, and is forced to rely for the accuracy of what he states upon the general information of those who have sold the goods, rendered the services, or done the other necessary parts of a completed transaction. An obvious administrative necessity exists that the proponent be permitted to show, under such circumstances, the system of doing business in the particular establishment in question. Having done this, he may be permitted to show that the entry was accurately made from reports duly made or transmitted in the course of business, and, so far as practicable, that the reports were made by persons who had personal knowledge of the facts stated by them to him in the form of a report. And should it prove impossible to procure the testimony of the informant and actor, because he is either dead or absent from the jurisdiction, or because for some other reason he is not available, his attendance will be excused. The same author presents the authorities from the several states, pro and con, whether the person furnishing the information on which the entry is made must be produced if available as a witness, and cites as authority, *Murray & Peppers v. Dickens*, 149 Ala. 240, 42 South. 1031. That case was in assumpsit, and involved the rule of introduction of account book entries in a controversy between the parties, which rule now finds expression in section 4003 of the Code of 1907.

In the sixteenth edition of Greenleaf on Evidence (volume 1, § 120a) regular entries in the course of business are discussed as exceptions to the hearsay rule. This authority declares that that which gives trustworthiness to such statements and affords a reason for receiving them as an exception to the rule "is the habit and system of making the entries as a part of the ordinary and regular course of business, removing the ordinary motives for untruth, and adding certain safeguards for correctness."— *Poole v. Dicas*, 1 Bing. N. C. 649; *Welsh v. Barrett*, 15 Mass. 380; *Fennerstein's Champagne*, 3 Wall. 149, 18 L. Ed. 121; *Avery v. Avery*, 49 Ala. 193, 195. These general safeguards are declared to be that the entry must have been made in the course of business; that it must be of a class made more or less regularly, and must record a fact pertinent to the issue; that it must be in the handwriting of the entrant; and that the entrant had no apparent motive to misrepresent. Moreover, when offered in evidence, the entry must be produced in its original form, if this can be done, in accordance with the principles of primariness (1 Greenl. Ev.

§ 563a), and the entry must be of a fact within the personal knowledge of the declarant (*Avery v. Avery, supra; McDonald v. Carnes,* 90 Ala. 148, 7 South. 919). In these cases the evidence was offered under the shopbook rule. Sheets of paper, however, on which separate entries had been made, have been received under this rule, where the entries were fair and free from suspicious alterations, and on the face of the record it was shown to have been regularly and correctly kept.—1 Whart. Ev. § 684; *Hooper v. Taylor,* 39 Me. 224; *Smith v. Smith,* 4 Harr. (Del.) 532; *Taylor v. Tucker,* 1 Ga. 231; *Sargeant v. Pettibone,* 1 Aikens (Vt.) 355; *Loyd v. Loyd,* 1 Redf. (N. Y.) 399; *Robinson v. Hoyt,* 39 Mich. 405; *Caldwell v. McDermit,* 17 Cal. 464; *Doster v. Brown,* 25 Ga. 24, 71 Am. Dec. 153.

Further discussing this safeguard for correctness—that the entry must be of a fact within the personal knowledge of the declarant—Greenleaf's annotator says: "The difficult question arises in the application of this part of the principle, where two persons have co-operated in the entry, one having personal knowledge and reported to the other, and the other writing down the transaction thus reported; the typical cases being that of a salesman and entry clerk or bookkeeper and that of a workman and a foreman recording the work reported. Where both such persons are brought to the stand, no question of a hearsay exception arises; and it will be seen later that, upon the principle of using a past recollection, the combined testimony of the two should suffice to admit the entry. But where one of them—usually the salesman, workman, or other person having personal knowledge —does not appear as a witness, the entry can be received, if at all, only under the present exception. That it should be so received seems proper, on principle as well as for reasons of practical convenience; for (apart from the English doctrine admitting oral reports) if the salesman, etc., has made a regular report in the course of business, which has not taken written shape, it seems not to be essential whether it is he or another who gives that written shape, and accordingly an entry, verified by the person making it, of a regular oral report by a person not now available, would seem admissible. The cases represent various attitudes on the part of the courts. Some courts are willing to receive such entries where the person making them verifies their correctness on the stand and the original observer—salesman, etc.—is dead or otherwise unavailable.—*Stanley v. Wilker-*

*son*, 63 Ark. 556, 470, S. W. 1043; *Amer. S. Co. v. Pauly*, 72 Fed. 470, 18 C. C. A. 644, 38 U. S. App. 254. Other courts go even further, and admit them without accounting for the original observer, on the sound consideration that it is practically impossible in mercantile conditions to trace and procure every one of the many individuals who reported the transactions."

See, also, *Fielder v. Collier*, 13 Ga. 499 (leading case) ; *Schaefer v. R. Co.*, 66 Ga. 39; *Chisohlm v. Machine Co.*, 166 Ill. 101, 43 N. E. 796; *Donovan v. R. Co.*, 158 Mass. 450, 33 N. E. 583; *Nelson v. Bank*, 69 Fed. 798, 16 C. C. A. 425, 32 U. S. App. 554 (leading case) ; *North P. R. Co. v. Keyes* (C. C.) 91 Fed. 47; *U. S. v. Cross*, 20 D. C. (9 Mackey) 379; *Dohmen v. Insurance Co.*, 96 Wis. 38, 71 N. W. 69.

In *Elliott v. Dycke*, 78 Ala. 150, an action in the nature of ejectment, Chief Justice STONE said : "When a witness is shown to be dead, or beyond the jurisdiction of the court, written entries and memorials of a transaction, entered in the usual course of business, and which are shown to be in the handwriting of the absent or deceased witness, and purport or are shown to have been made at or about the time of such alleged transaction, are admissible evidence, in any issue involving the transaction to which they relate."

See, also, 1 Greenl. Ev. § 118, and notes; *Union Bank v. Knapp*, 3 Pick. (Mass.) 96 s. c., 15 Am. Dec. 289; *Avery v. Avery*, 49 Ala. 193; *Chaffee v. U. S.*, 18 Wall. 516, 21 L. Ed. 908.

In *Sands v. Hammell*, 108 Ala. 624, 628, 18 South. 489, 491, a bill in equity to declare and settle a trust, the court said : "In *Bank v. Plannett*, 37 Ala. 226, it was said 'that books of accounts kept by a deceased clerk, and all other entries or memoranda made in the course of business or duty, by any one who would at the time have been a competent witness to the fact which he registers, are admissible evidence.' "

See, also, *Hancock v. Kelly*, 81 Ala. 369, 2 South. 281; *Terry v. Birmingham Nat. Bank*, 93 Ala. 599, 9 South. 299, 30 Am. St. Rep. 87.

Such entries were held admissible, not only to prove their contents, but also to corroborate or impeach other evidence, in *Monroe v. Snow*, 131 Ill. 136, 23 N. E. 401, and *People v. Kemp*, 76 Mich. 410, 43 N. W. 439, and, when acquiesced in by another party, held binding against him in a suit against him and a third party, as admissions or estoppels, in *Loewenthal v. McCormick*,

101 Ill. 143, and *Chateaugay.v. Blake,* 144 U. S. 476, 12 Sup. Ct. 731, 36 L. Ed. 510.

The principle underlying the production of such evidence against third parties, when it is relevant to the fact in issue, is moral necessity.—*Sharp v. Blanton,* 196 Ala. 460, 69 South. 889; *Barfield v. Evans,* 187 Ala. 579, 589, 65 South. 928; *Sands v. Hammell, supra; Bank v. Plannett,* 37 Ala. 222, 226; *Elliott v. Dycke, supra.*

In *Sharp v. Blanton, supra,* the authorities were examined, and it was declared that the shopbook rule is founded on the principle of necessity; such evidence being the best available after the death of the party making the entries. The account book of entry in that case was admitted, as tending to show the date of a litigant's birth, by the entry in the "shopbook" of the attending physician, who was supposed to know the facts and to make a true entry thereof.

In *Minge v. Barrett Bros.,* 196 Ala. 655, 72 South. 259, and *Hitt Lumber Co. v. McCormack,* 13 Ala. App. 453, 68 South. 697, daily reports made in the regular course of business, in the nature of original entries, were held admissible in evidence, and to be prima facie correct.

The rule declared in *Donaldson v. Wilkerson,* 170 Ala. 507, 54 South. 234; *Dickens v. Murray & Peppers,* 163 Ala. 556, 559, 50 South. 1019, and *Dickens v. Murray & Peppers, supra,* governs in suits between parties where the account book of entries made in the regular course of business between them, properly authenticated, is introduced in evidence.

The cases of *Humes v. O'Bryan,* 74 Ala. 64, *Trammel v. Hudmon,* 78 Ala. 222, and *Hart v. Kendall,* 82 Ala. 144, 3 South. 41, involved the application of the general rule that declarations of a third person are to be regarded as mere hearsay, and are not competent as evidence, unless such declarations are the best evidence of which the nature of the case will admit, and it is shown that they were against the interest of the declarant when made, that he had competent knowledge of the fact stated, and that he is since deceased, insane, or beyond the jurisdiction of the court.

Reason and better authority seem to be in accord with this statement of the rule: Where the entry is made by one person in the regular course of business, recording an oral or written report, made to him by one or more other persons in the regular

course of business, of a transaction lying in the personal knowledge of the latter, there is no objection to receive that entry under the present exception to the hearsay rule, provided the practical inconvenience of producing on the stand the numerous persons thus concerned would in the particular case outweigh the probable utility of doing so.

It may be observed that on the motion for a new trial for the first time the method of taking the names and time of the men working in the mine—the reporting of the same daily in writing by Mr. Cook to Mr. George Adams, the timekeeper, who, in the due course of the business of the company and of his duty, entered the same on the payroll—was made known to the court. So also the availability as a witness of this transactor, Cook, and the availability as evidence of Cook's daily written reports to Adams, was not made known on the trial when the evidence in question was excluded.

The testimony offered for the consideration of the jury would have some tendency to shed light on the whereabouts of the two witnesses just before and at the time of the alleged injury, and on their opportunity to observe the facts testified to by them, and a further tendency to illustrate the credence of which said witnesses were worthy. The jury should not have been denied the right to give to these relevant entries on the pay roll such weight as they believed it entitled to when considered with all the other evidence in the case.

(4) Moreover, the matter sought to be proven by the pay roll was a collateral fact in the instant case, and the best evidence rule did not apply.—Jones on Ev. § 138; *Holmes v. Goldsmith,.* 147 U. S. 150, 13 Sup. Ct. 288, 37 L. Ed. 118; *Mobile, J. & K. C. R. R. Co. v. Hawkins,* 163 Ala. 565, 51 South. 37; *Stearnes v. Edmonds,* 189 Ala. 487, 66 South. 714.

It results that the judgment of the circuit court must be affirmed.

Affirmed.

ANDERSON, C. J., and MAYFIELD and SOMERVILLE, JJ., concur.